*Daniel Mills v. State of Maryland*, No. 950, September Term, 2017, filed November 5, 2018.  Opinion by Battaglia, J.

**CRIMINAL PROCEDURE —** *Batson v. Kentucky* **— NATURE OF CLAIM:**  The exercise of peremptory challenges by any party to a case, criminal or civil, on the basis of race, gender, or ethnicity violates the Equal Protection Clause of the Fourteenth Amendment.

**CRIMINAL PROCEDURE —** *Batson v. Kentucky* **— THREE-STEP PROCEDURE FOR RESOLVING A CHALLENGE:**  The Supreme Court has set forth a three-step procedure that a trial court must follow in resolving a claim of discriminatory exercise of peremptory strikes.  At step one, the party raising the *Batson* challenge must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Then, once the challenger makes a prima facie showing, the burden shifts to the opposing party to come forward with a neutral explanation for the exercise of its peremptory strikes.  Finally, in light of the parties' submissions, the trial court must determine whether the challenger has shown purposeful discrimination.

**CRIMINAL PROCEDURE —** *Batson v. Kentucky* **— BURDEN OF PRODUCTION AT STEP ONE:**  The party raising a *Batson* challenge bears the burden to produce "some evidence" that the opposing party's peremptory challenges were exercised on one or more of the constitutionally prohibited bases.  A challenger satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

**CRIMINAL PROCEDURE —** *Batson v. Kentucky* **— BURDEN OF PRODUCTION AT STEP ONE — NOT A STATISTICAL TEST:**  The Supreme Court has expressly rejected a statistical test at the first step of the *Batson* analysis, observing that the Constitution forbids striking even a single prospective juror for a discriminatory purpose.

**CRIMINAL PROCEDURE —** *Batson v. Kentucky* **— TRIAL COURT ERRED IN APPLYING A STATISTICAL TEST AT STEP ONE:**  The circuit court erred in applying a statistical test to conclude that the defendant had failed to establish a prima facie case of discriminatory intent.  Had the court applied the correct test, on the facts of this case, it would have been compelled to conclude that the defendant had satisfied his initial burden.

**CRIMINAL PROCEDURE —** *Batson v. Kentucky* **— REMEDY FOR ERROR:**  Unless it is impossible to reconstruct the circumstances surrounding the peremptory

challenges, due perhaps to the passage of time or the unavailability of the trial judge, the proper remedy where the trial court does not satisfy *Batson*'s requirements is a new *Batson* hearing in which the trial court must satisfy the three-step process mandated by that case and its progeny.

**CRIMINAL PROCEDURE — *Batson v. Kentucky* — REMEDY FOR ERROR:** In the instant case, it would not be impossible to reconstruct the circumstances surrounding the aborted *Batson* hearing, given the existence of the juror lists and the relatively brief time that has elapsed since trial. Moreover, the circuit court's error denied the State an opportunity at trial to explain its reasons for exercising the contested peremptory challenges. Accordingly, the remedy here is a limited remand so that the circuit court may conduct a new *Batson* hearing.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 950

September Term, 2017

_____

DANIEL MILLS

v.

STATE OF MARYLAND
_____

*Eyler, Deborah S.,
Meredith,
Battaglia, Lynne A.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Battaglia, J.
_____

Filed: November 5, 2018

*Eyler, Deborah S., J., participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a retired, specially assigned member of this Court.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document " authentic.



Suzanne C. Johnson, Acting Clerk

A jury sitting in the Circuit Court for Baltimore City convicted Daniel T. Mills, appellant, of possession of cocaine with intent to distribute as well as simple possession of that drug. The circuit court thereafter sentenced Mills to twelve years' imprisonment, with all but four years suspended, to be followed by three years' probation. Mills then noted this appeal, raising the following issues:

> I. Whether the trial court erred in holding that the defendant failed to make a prima facie showing of discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986), based solely on the court's finding that the racial makeup of the seated jury resembled the racial makeup of the jury pool;
>
> II. Whether the State failed to present sufficient evidence that the defendant possessed cocaine when there was no evidence that the defendant could see the cocaine in the vehicle in which he was a passenger; and
>
> III. Whether the prosecutor's improper and repeated suggestions in closing argument that the defendant was right-handed, a fact not in evidence, require a new trial.

We hold that the trial court erred in aborting Mills's *Batson* challenge at step one of the inquiry. We further hold that the evidence was sufficient to sustain the convictions and that the claim concerning the prosecutor's comments was not preserved but that, in any event, those comments were not improper. Finally, for reasons we shall explain henceforth, we hold that the appropriate remedy for the court's *Batson* error is a limited remand for a hearing on Mills's *Batson* challenge, to determine whether he is entitled to a new trial.

## BACKGROUND

In the early morning hours of March 21, 2016, Detective Melvin Jones of the Baltimore City Police Department was on "routine patrol" in a marked police cruiser when he observed a blue Chevrolet Cruze traveling westbound on Pulaski Highway near Highland Street in Baltimore City. As the Chevrolet approached a red light and came to a stop, Detective Jones pulled up behind it and, using an onboard electronic database, ran a "random tag check." In doing so, he noticed that its owner, David Fitzgerald, had a suspended driver's license. After pulling alongside the Chevrolet and confirming that Fitzgerald was, in fact, driving, Detective Jones initiated a traffic stop, notifying his dispatcher as he did so. There was one other occupant of that vehicle—Mills, who was sitting in the front passenger seat.

Detective Jones approached the Chevrolet and "made contact with" Fitzgerald. While he was speaking with Fitzgerald, Officers Derek Bowman and Jacob Reed, having heard about the traffic stop from the dispatcher, arrived at the scene, having driven separately in marked police vehicles.

As a precaution, Officer Reed parked directly in front of Fitzgerald's Chevrolet to prevent it from moving, while Officer Bowman pulled in behind Detective Jones's vehicle. Officer Reed then approached the passenger side of Fitzgerald's car and began speaking with Mills, asking him "where they were both coming from and where they were going," but Mills sat silently, ignoring the officer's questions and avoiding eye contact.

2

Meanwhile, an "intoxicated male" bystander "started walking up to" Fitzgerald's vehicle and "yelling something like he knew the individual in the car." Officer Bowman "told him several times" that he needed to "stand to the side." Eventually he heeded that advice and left the scene.

Officer Reed, who had been questioning Mills, then asked him to step out of the vehicle and "stand towards the back," where Officer Bowman was then located. After Mills complied with that request, Officer Reed "knelt over and looked under the [front passenger] seat." When he did so, he saw a Glock 9 mm semiautomatic handgun "under the seat." The officer "backed away from" the car and several times said "1030," a code indicating that he intended to arrest Mills. Neither Officer Bowman nor Detective Jones heard that warning, however. Then, looking at Detective Jones, Officer Reed said, "Gun." Upon hearing the latter exclamation, Mills "took off running northbound on Highland Avenue."

Detective Jones and Officer Bowman gave chase, while Officer Reed remained with Fitzgerald's car. The pursuing police officers were joined in the chase by Sergeant Frederick Steigerwald, who was stationed nearby and who had heard about the foot chase over the police radio. Sergeant Steigerwald ultimately found Mills hiding underneath a parked truck, four blocks from the scene of the traffic stop.

A search incident to Mills's arrest yielded a "bundle" of cash in his right front pocket, totaling $1,676, as well as two cell phones. When Fitzgerald's car was searched, Officer Reed recovered, in an open storage compartment in the passenger side door, "a

3

clear plastic bag" containing what was later confirmed to be crack cocaine, lying next to a pair of socks, as well as the aforementioned handgun.

A thirteen-count indictment was returned, charging Mills with possession of, and conspiracy to possess, a firearm under sufficient circumstances to constitute a nexus to drug trafficking; three counts of possession of a regulated firearm after conviction of a disqualifying crime; wearing, carrying, and transporting a handgun in a vehicle, and conspiracy to do the same; wearing, carrying, and transporting a handgun on and about the person; possession of ammunition after conviction of a disqualifying crime; possession of, and conspiracy to possess, cocaine with intent to distribute; and possession of, and conspiracy to possess, cocaine.

The case proceeded to a jury trial, which began with a *Batson* challenge that will be discussed more fully. Following various dismissals and grants of motions for judgment of acquittal, five charges were presented to the jury: possession of cocaine with intent to distribute; possession of cocaine; possession of a firearm under sufficient circumstances to constitute a nexus to drug trafficking; possession of a regulated firearm after conviction of a disqualifying crime; and possession of ammunition after conviction of a disqualifying crime. The jury convicted Mills of both drug offenses and acquitted him of all firearms-related offenses. The court sentenced Mills to a term of twelve years' imprisonment, with all but four years suspended, to be followed by three years' probation, for possession of cocaine with intent to distribute and merged the simple possession count. Mills thereafter noted this timely appeal.

4

## ANALYSIS

### *Mills's <u>Batson</u> Challenge*

Mills contends that the trial court erred in concluding that he did not establish a prima facie case, under *Batson*,[1] that the State had exercised its peremptory challenges in a racially discriminatory manner. He further contends that the remedy for that error is a new trial.

The State counters that the trial court "properly, if perhaps inartfully, determined that Mills did not establish a prima facie case of 'purposeful' discrimination." In the alternative, the State asks that, if we were to agree with Mills that the trial court erred in determining that Mills did not establish a prima facie case, we order a limited remand so that the court may consider Mills's *Batson* challenge.

In *Batson*, the Supreme Court held that the prosecution's exercise of peremptory challenges in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment. *Batson*, 476 U.S. 79, 89 (1986). *Batson* and its progeny[2] established a three-step process for resolving a claim of purposeful discrimination in the

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[2] Although not relevant to the instant case, we observe that the holding in *Batson* has subsequently been extended in several noteworthy respects. *See*, *e.g.*, *Powers v. Ohio*, 499 U.S. 400 (1991) (holding that a criminal defendant may object to the prosecution's racially-based exercise of peremptory strikes, regardless of whether he belongs to the same racial category as the excluded venirepersons); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991) (holding that *Batson* applies to civil actions); *Georgia v. McCollum*, 505 U.S. 42 (1992) (holding that a criminal defendant may not exercise his peremptory strikes in a racially-discriminatory manner); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (holding that *Batson* applies to the gender-based exercise of peremptory strikes).

exercise of peremptory strikes. Initially, the defendant must "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 168 (quoting *Batson*, 476 U.S. at 93-94). Then, "[o]nce the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97. Finally, "in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (citations and quotations omitted).

At step one, Mills's burden was to "produce some evidence" that the State's peremptory challenges were exercised "on one or more of the constitutionally prohibited bases," in this instance, race. *Ray-Simmons v. State*, 446 Md. 429, 436 (2016) (citing *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam)). A "defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170.

In the instant case, as jury selection proceeded, the State, in a harbinger of what would later become an issue in this appeal, raised a *Batson* challenge against the defense, apparently alleging that all of Mills's peremptory strikes had, thus far, been exercised against Caucasians (or, in any event, against all but African-Americans).[3] The following colloquy took place:

---

[3] By the time that the State raised its *Batson* challenge, the defense had exercised peremptory strikes against Jurors 2118, 2167, 2170, and 2181. Although the juror list, in the record, indicates the venirepersons' age, sex, marital status, highest attained education

(continued)

6

[THE STATE]:  Your Honor, at this time --

(The defendant approached the bench.)

[THE STATE]:  -- the State is respectfully challenging based on Batson?

THE COURT:  Well, I've got to tell you I'm not exactly sure what the race of the -- the gentleman [Juror 2181] who sat down was.

[DEFENSE COUNSEL]:  And I struck him because he was late.

THE COURT:  Huh?

[DEFENSE COUNSEL]:  I couldn't read his number.  I don't --

THE COURT:  Okay.  But I don't know what his -- his race is?

[DEFENSE COUNSEL]:  **I understand.  I'm just telling you why.**

THE COURT:  **But I have to make the analysis.  You're -- I'm not calling upon you to make the analysis.**

[DEFENSE COUNSEL]:  I understand.

_____

(continued)

level, occupation, and spousal occupation, it does not indicate race.  Handwritten notes on the State's copy of that list, which is also in the record, indicate, however, the race of each venireperson.  Juror 2118 was a Caucasian, married, 56-year-old female, who had attended graduate school, was employed as an author, and whose spouse was an attorney; juror 2167 was an Asian, single, 32-year-old female, who had attended graduate school and was employed as a policy analyst; juror 2170 was a Caucasian, married, 53-year-old female, with a high school education, whose employment was listed as "database" and whose spouse had no listed occupation; and juror 2181 was a Caucasian, single, 39-year-old male, with a high school education, who was employed as an "installer."

> THE COURT: All right. **So the record is complete, I was the initial scan indicated that the males constituted 37 percent, which means we ought to have about 4.5 men in the jury, and that the whites accounted for 27 percent, which means that we should have about 3.3 whites on the jury if they just -- the normal shuffle just filled up the jury box.**
>
> So under those circumstances, considering the fact that at this moment, we have one, two, three, -- three white women and one, two men in the jury box, **I don't believe that the statistical scan establishes a prima facie case, so the motion is denied.**

(Emphasis added.)

Notably, the court did not appear to consider the question of discriminatory intent at the level of the individual venirepersons stricken, but instead, as shown by a statistical model that compared the racial and gender composition of the empaneled jury with that of the venire. In any event, after the court denied the State's *Batson* challenge on that basis, jury selection resumed.

Shortly thereafter, the parties commenced making additional strikes from the box. The State struck Juror 2132, a married, 61-year-old African-American female whose highest attained education level was indicated, "HS OR GED – NA" and whose occupation (as well as that of her spouse) was likewise indicated, "NA." In total (including Juror 2132), the State had made four peremptory strikes against African-American venirepersons. The others stricken by the State included Juror 2119, a single, 64-year-old male with a high school education; Juror 2155, a single, 60-year-old female with a high school education; and Juror 2164, a single, 39-year-old female with a high school education.

8

At that point, the defense raised its own *Batson* challenge. In response, the State acknowledged, "I'll concede based on the pattern." The following colloquy then took place:

> THE COURT: Okay. But the pattern is still consistent. And --
>
> [DEFENSE COUNSEL]: **The pattern of strikes is all African/Americans.**
>
> THE COURT: **But the strikes left us with one, two, three, four whites, though I was expecting 3.3. And as far as males, one, two, three, four, five, when I was expecting 4.5.**
>
> **Nothing the State has done has changed the -- the basic appearance of the way the jury would have looked had we just thrushed the crowd and said "Everyone run up and take a seat." So I'm going to deny the motion, as a prima facie case has not been established yet.**
>
> [DEFENSE COUNSEL]: Judge, can I just briefly be heard, that I -- **I don't think that necessarily the panel jury is the standard. It's whether the State is striking individual jurors because of their race.**
>
> THE COURT: No. You see, if -- if 75 percent of the people who came in were black females, I would expect that 75 percent of the people who were stricken would be black females. That's why **I do a statistical analysis on how I'm expecting the jury to look and see whether or not actions taken by the parties is taking that out of balance.**
>
> **That I believe is part of what I'm required to do for the initial prima facie showing. It's not just a question of how many strikes you used against a particular group.**
>
> No matter how that would seem, it depends on how things are. Because, let's face it, most of the people who came into the room when we called for and ended up getting 57 people, most of the people were black females.

9

(Emphasis added.) With that, the court denied Mills's *Batson* challenge.[4]

The circuit court clearly erred in applying its statistical test for determining whether Mills had set out a prima facie case of racial discrimination by the State in its exercise of peremptory strikes. The Supreme Court has expressly rejected a statistical test at the first step of the *Batson* analysis, observing that the "Constitution forbids striking even a single prospective juror for a discriminatory purpose"[.]" *Snyder v. Louisiana*, *supra*, 552 U.S. at 478 (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)).[5]

Moreover, had the circuit court applied the proper test—whether the opponent of the strikes had shown "that the totality of the relevant facts gives rise to an inference of discriminatory purpose," *Batson*, 476 U.S. at 94—it would have been compelled to conclude that Mills had satisfied his initial burden. For example, in *Johnson v. California*, *supra*, 545 U.S. 162, the Supreme Court held that, where all three African-American venirepersons had been peremptorily stricken by the prosecution, the inference of discriminatory intent was "sufficient to establish a prima facie case under

---

[4] Upon the conclusion of jury selection, Mills's counsel, when asked whether the empaneled jury was acceptable, replied, "Your Honor, yes, acceptable pursuant to my motions," thereby preserving this issue for appeal. *See*, *e.g.*, *Gilchrist v. State*, 340 Md. 606, 618 (1995) (observing that when "a party complains about the exclusion of someone from or the inclusion of someone in a particular jury, and thereafter states without qualification that the same jury as ultimately chosen is satisfactory or acceptable, the party is clearly waiving or abandoning the earlier complaint about that jury").

[5] The *Snyder* Court cited the following additional cases in support of the same proposition: *United States v. Lane*, 866 F.2d 103, 105 (4th Cir. 1989); *United States v. Clemons*, 843 F.2d 741, 747 (3d Cir. 1988); *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987); and *United States v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986).

*Batson.*"  *Id.* at 173.  In *Ray-Simmons v. State*, *supra*, 446 Md. 429, the Court of Appeals concluded that where, at the time the defendants had raised their *Batson* challenge, "the State had exercised five peremptory challenges, all of which were to remove African American men," the "evidence sufficed to establish a prima facie case of race and gender discrimination."  *Id.* at 443 (citations omitted).  In *Tolbert v. State*, 315 Md. 13 (1989), the Court of Appeals held that, where the State had exercised its "first four peremptory challenges to strike black individuals," the trial court was entitled to conclude that the defendant had established a prima facie case.  *Id.* at 18.  And in *Stanley v. State*, 313 Md. 50 (1988), where the State had exercised eight of its ten peremptory strikes against African-Americans, the Court of Appeals concluded that "there was enough evidence presented to establish a prima facie case of discrimination against black jurors."  *Id.* at 72-73.  Given this line of authority, we hold that, where the State had exercised four peremptory strikes, all against African-Americans, and where it had apparently conceded as much below ("I'll concede based on the pattern."), the circuit court clearly erred in ruling that Mills had not established a prima facie case of discriminatory intent.

We next consider the appropriate remedy for the circuit court's error.  In *Ray-Simmons v. State*, 446 Md. 429, the Court of Appeals set forth the usual rule:

> [U]nless it is impossible to reconstruct the circumstances surrounding the peremptory challenges, due perhaps to the passage of time or the unavailability of the trial judge, the proper remedy where the trial court does not satisfy *Batson*'s requirements is a new *Batson* hearing in which the trial court must satisfy the three-step process mandated by that case and its progeny.

11

*Id.* at 447 (quoting *Edmonds v. State*, 372 Md. 314, 339-40 (2002)). The Court went on to explain that a "limited remand may be appropriate, for example, where the State was not given an opportunity at trial to explain its reasons for exercising the contested peremptory challenges." *Id.* (citing *Mejia v. State*, 328 Md. 522, 540 (1992), and *Stanley v. State*, 313 Md. 50, 75-76 (1988)). That is precisely what occurred here.

We acknowledge that, under some circumstances, a limited remand is not the appropriate remedy for a *Batson* error. For instance, the *Ray-Simmons* Court ordered a new trial because it was "persuaded that it would be impossible to reconstruct a jury that tried and convicted Petitioners almost four years ago." *Id. See Chew v. State*, 317 Md. 233, 239 (1989) (observing that a new trial is the appropriate remedy for a *Batson* violation when "the passage of time precludes fair consideration of the relevant issues"); *see also Tyler v. State*, 330 Md. 261, 271 (1993) (remanding for new trial where the State had admitted that its peremptory strikes had been exercised for a discriminatory purpose).

In the instant case, however, we are not persuaded that it would be "impossible to reconstruct the circumstances surrounding" the aborted *Batson* hearing, *Ray-Simmons*, 446 Md. at 447, given the existence of the juror lists and the relatively brief time that has elapsed since trial in this case. *Chew*, 317 Md. at 239 (holding that, despite "certain difficulties" that "are inherent in attempting to reconstruct events that occurred a year or more earlier, but where a reasonable possibility exists that reconstruction can be fairly accomplished, the attempt is worth the effort," and a limited remand is "appropriate"). Moreover, the trial court's error denied the State "an opportunity at trial to explain its reasons for exercising the contested peremptory challenges." *Ray-Simmons*, 446 Md. at

12

447; *see Mejia*, 328 Md. at 540 (holding that, where "[l]ess than two years" had elapsed since jury selection had begun, there had not been "a sufficient lapse of time to justify a grant of a new trial without affording the prosecution the opportunity to provide racially neutral reasons for its exercise of the subject peremptory challenge"); *accord Stanley*, 313 Md. at 75-76.

For these reasons, we shall order a limited remand for "a new *Batson* hearing in which the trial court must satisfy the three-step process mandated by that case and its progeny." *Ray-Simmons*, 446 Md. at 447. *See* Md. Rule 8-604(d)(1) (permitting a limited remand if an appellate court "concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings"). The procedure to be followed is that outlined in *Edmonds*, *supra*, 372 Md. 314—the circuit court must allow the prosecution an opportunity to set forth "race-neutral reasons" for its peremptory strikes, and it must then decide whether those reasons are bona fide or "pretextual." *Id.* at 341. If the court finds that Mills "has met his burden of proving purposeful discrimination," it "shall order a new trial," but if it finds otherwise, then the judgments shall be affirmed. *Id.* at 341-42. *See also Stanley*, 313 Md. at 77-80.

### Sufficiency of the Evidence

Mills challenges the sufficiency of the evidence to sustain his convictions of possession of cocaine with intent to distribute and simple possession. In reviewing the sufficiency of the evidence to sustain a conviction, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

13

have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In conducting that review, we give "due regard to the [fact finder's] finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *Moye v. State*, 369 Md. 2, 12 (2002) (citation and quotation omitted).

"Circumstantial evidence may support a conviction if the circumstances, taken together, do not require the trier of fact to resort to speculation or conjecture, but circumstantial evidence which merely arouses suspicion or leaves room for conjecture is obviously insufficient." *Smith v. State*, 415 Md. 174, 185 (2010) (citations and quotations omitted). Rather, the circumstances must "afford the basis for an inference of guilt beyond a reasonable doubt." *Id.* (citations and quotations omitted).

"'Possess' means to exercise actual or constructive dominion or control over a thing by one or more persons." Md. Code (2002, 2012 Repl. Vol., 2015 Supp.), Criminal Law Article ("CL"), § 5-101(v). Because a person "ordinarily would not be deemed to exercise 'dominion or control' over an object about which he is unaware," knowledge of its presence "is normally a prerequisite to exercising dominion and control" and, hence, possession. *Dawkins v. State*, 313 Md. 638, 649 (1988). Possession may be "actual or constructive," and it may be "either exclusive or joint in nature." *Moye*, 369 Md. at 14.

Mills maintains that the circumstantial evidence adduced at his trial was insufficient to support an inference, beyond a reasonable doubt, that he was aware of the presence and nature of the cocaine recovered from the passenger-side door pocket of the vehicle in which he had been riding. We disagree.

14

In assessing whether a person jointly exercises dominion and control over contraband, Maryland appellate courts have typically applied the four-factor test set forth in *Folk v. State*, 11 Md. App. 508 (1971).  *See Smith*, 415 Md. at 198-99 (citing cases applying those factors).  Those factors are:

> 1) proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, [and] 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

*Folk*, 11 Md. App. at 518.

The cocaine was recovered from an open compartment in the passenger-side door of the vehicle.  Mills had been seated in the front passenger seat—the seat that was closest to the passenger-side door.  Moreover, although the jury acquitted him of the handgun charges, we note that the handgun was recovered from beneath the passenger-side front seat, in which Mills had been sitting.  Thus, there certainly was proximity between Mills and the contraband.

We next consider whether the cocaine was in Mills's view or otherwise within his knowledge.  Mills asserts that the contraband was not only out of his view, but it was also unclear whether it had been stored with items (the socks) that did not belong to him, which, in his view, further dilutes the inference that the contraband belonged to him.  He ignores, however, that a photograph depicting the bag of cocaine in the door compartment was admitted into evidence and indicates that the bag was visible and,

15

specifically, not concealed by the pair of socks. Construing this exhibit in a light most favorable to the State, as we must, we hold that, contrary to Mills's assertion, a reasonable jury could have concluded that the cocaine was visible to the passenger of the car.

Moreover, under Mills's hypothesis, it would necessarily be true that Fitzgerald, the driver of the vehicle, possessed the contraband. We think it unlikely that Fitzgerald would have stored contraband in the passenger-side door when other alternatives, such as the compartment in the driver-side door or even the trunk, were available to him, unless, at minimum, he and Mills jointly possessed the contraband. Whether to draw this or the opposite inference, as Mills would have us do, was properly within the province of the jury. *See*, *e.g.*, *State v. Smith*, 374 Md. 527, 557 (2003) (observing that, in reviewing the sufficiency of the evidence, the issue is "not whether the [fact finder] could have made other inferences from the evidence or even refused to draw any inference, but whether the inference [it] did make was supported by the evidence").

The third factor, whether Mills had an ownership or possessory interest in the vehicle, does not weigh in favor of Mills's possession of contraband found within it. We accord that factor, however, only slight significance, as otherwise we would be forced to conclude that a passenger in a vehicle does not typically possess items found in close proximity to him.

As for the fourth factor, the presence of circumstances from which a reasonable inference could be drawn that Mills was participating in the mutual use of the contraband, we note that, upon hearing a police officer call out, "Gun," Mills fled the scene and was

16

discovered, shortly thereafter and four blocks away, hiding beneath a truck. That flight and ensuing concealment could properly be considered by the jury as evidence of consciousness of guilt. *See*, *e.g.*, *Thompson v. State*, 393 Md. 291, 305 (2006). Mills's assertion that he fled out of fear of being accosted by the "intoxicated male" bystander merely goes to the weight, not the sufficiency, of the evidence, because the jury was free to infer that Mills's flight was motivated, instead, by his consciousness of guilt. *Smith*, 374 Md. at 557. Under all the circumstances, there was sufficient circumstantial evidence of Mills's knowledge of the presence and nature of the contraband, including the cocaine.

### *Prosecutor's Comments*

Mills complains that the prosecutor improperly commented upon a matter not in evidence during closing argument, specifically, whether he is right-handed. Because, he asserts, the evidence against him was "quite weak," that improper comment cannot be deemed to have had no effect on the verdict, and he therefore claims that reversal is required.

The State counters that this claim is unpreserved because Mills objected only to entirely different prosecutorial comments regarding the handgun and the purported location a "hack" would store narcotics. But, maintains the State, even on the merits of this claim, the prosecutor's comment was within the scope of permissible argument, as it was based upon the jury's observation of the defendant and the reasonable inferences it could draw from that observation.

17

We begin by setting forth some factual background. During the State's closing argument, the following took place:

> THE STATE: We know that the defendant was prohibited from possessing this [the handgun] due to a prior conviction. That's what we know. So we know (Inaudible at 12:07:14 p.m.) So the question is whether the defendant possessed this.
>
> Now, we know the defendant was sitting in the passenger seat. We know a guy named David Fitzgerald, who is not here today, sitting in the driver's seat. We know -- we heard earlier that the seats were lower, lower to the floor than these chairs are that I'm using here as a demonstration. But we would imagine the seats would be about even.
>
> **Now, if I'm the driver, it's awfully hard for me to get this gun over and under that seat. And if I was able to, I imagine the gun would look something like that.**
>
> [DEFENSE COUNSEL]: **Objections, Your Honor, to the "imagine the gun."**
>
> THE COURT: Overruled. This is argument.
>
> THE STATE: I'm the passenger, I have a gun in my pocket or in my dip, and the police pull me over, **and I'm right handed,** that's how the gun's going to look when I place it under the seat. And I have drugs on me, I'm looking for somewhere else to stash them, pocket next to me.
>
> Now, if I'm the driver, and those are my drugs, and the police pull up behind me, and they are in my pocket or something like that, what am I going to do with my drugs? There's no way I'm getting them over there.
>
> And if I'm a hack, if I'm an unlicensed taxi and I drive people around as was suggested by the defense, am I going to keep my drugs in the pocket that my passenger sits in? No. That's not a good way to store your drugs.

18

And if I am storing my drugs in my vehicle for any long-term trip, why am I going to put it there? Why don't I put it in the trunk of my car, the police are probably not going to be able to search if I get pulled over.

[DEFENSE COUNSEL]: **Objection, Your Honor.**

THE COURT: Overruled. This is argument.

THE STATE: So we have drugs right here. We have a gun just like that. If you pretend that this thing isn't here, it would be laying flat.

**Now, I'm right handed. For me to face this in any other way, I would have to contort my body and do something like that unnaturally.**

If I was trying to hide it quickly, that's exactly how it's going. **Of course that's if I'm right handed.** And I would encourage you to try your best to recall which hand the defendant has been writing with this entire time throughout this trial. I think you can take a hint.

(Emphasis added.)

### *Preservation*

Mills contends that a general objection preserves all available grounds and that because he made a general objection below, his appellate claim that the prosecutor improperly argued a matter not in evidence was preserved. The State counters that Mills's objections were made to entirely different comments—the prosecutor's suggestion to the jury to "imagine the gun" and the prosecutor's comments regarding the optimal method a vehicle occupant would use to store contraband.

In our view, the State has the stronger argument. Although it is true, as Mills points out, that "when the trial court does not request a statement of the grounds for an

19

objection, a general objection is sufficient to preserve all grounds which may exist," *Ali v. State*, 314 Md. 295 (1988) (citations omitted), *abrogated on other grounds by Nance v. State*, 331 Md. 549 (1993), we think that Mills attributes talismanic powers to the general objection he lodged below and ignores the fact that an objection, whatever its character, must still be timely. *See Yates v. State*, 429 Md. 112, 130 (2012) (observing that the "rule of contemporaneous objection applies even to errors of constitutional dimension") (citing *Savoy v. State*, 420 Md. 232, 241-42 (2011)).

The general objection was made well after the State had made the remark of which Mills now complains, "and I'm right handed"; in fact, more than three paragraphs of transcript separate that remark from Mills's general objection. *See* Md. Rule 4-323(a) (providing that an "objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent" and that "[o]therwise, the objection is waived"). Furthermore, the State elaborated on that remark after Mills had made his general objection, and he did not repeat his earlier objection, nor did he at any time ask for a continuing objection. *Id.* § (b). We hold that Mills's appellate complaint, that the prosecutor made improper comments as to whether Mills is right-handed, was not preserved.

### *Merits of the Claim*

Even if Mills had preserved this claim for our review, we would hold that he has not shown reversible error. This requires us to consider a question that Maryland appellate courts have not directly addressed and on which courts from other states are in disagreement—whether a prosecutor may comment upon a physical characteristic of the

20

defendant that has not been the subject of any testimony but may nonetheless be observable by the jury, in this case whether the defendant is right-handed.

We shall briefly examine two appellate decisions from our sister jurisdictions, as they exemplify both sides of this issue: *People v. Ferguson*, 626 N.E.2d 930 (N.Y. 1993) (mem), and *Commonwealth v. Cohen*, 589 N.E.2d 289 (Mass. 1992).[6]

In *People v. Ferguson*, the Court of Appeals of New York held that

> [w]here no formal demonstration of the defendant's "handedness" had been presented during trial, the prosecutor's remark to the jury during summation—"[y]ou have been here through the course of the trial and [have] seen [defendant] sitting there. Defendant takes notes with his left hand"—constituted an improper reference to facts not in evidence[.]

*Id.* at 930 (citation omitted). The Court nonetheless affirmed Ferguson's robbery convictions because the trial court, unlike in the instant case, had given a curative instruction, "which directed the jurors to disregard the note-taking comment and clearly indicated that no evidence had been presented concerning whether defendant was left or right handed[.]" *Id.* at 930-31.

---

[6] Mills relies primarily upon *Good v. State*, 723 S.W.2d 734 (Tex. Crim. App. 1986) (en banc), but that case does not directly address prosecutorial comment regarding a defendant's right- or left-handedness. In *Good*, the prosecutor commented upon the defendant's "cold, unnerved, uncaring" demeanor during trial and opined that his demeanor could be construed as evidence of guilt, concluding that "you can be orderly and yet show something on your face." *Id.* at 735. The Court of Criminal Appeals of Texas held that those remarks were improper because they "focused on neutral or passive conduct that was not in evidence and compounded that error by using the neutral or passive conduct to make an unreasonable inference of guilt." *Id.* at 738. To the extent that *Good* is relevant to the instant case, its holding is entirely consistent with that of the Court of Appeals of New York in *Ferguson*.

21

In *Commonwealth v. Cohen*, during closing argument in a first-degree murder trial, the prosecutor stated to the jury: "But I would suggest to you the gunshot is consistent with a right-handed man. I think you've probably seen [the defendant] writing during this case on the paper. Reach around and fire a shot in the center of the back, downward." *Id.* at 296. The defense did not object to that comment. *Id.*

The Supreme Judicial Court of Massachusetts, applying a plain error standard of review, rejected Cohen's argument that the prosecutor had improperly commented on a fact not in evidence. The Court held that it was "not improper for the prosecutor to point out that the defendant was right-handed," citing a prior case that had held that it was not improper for the prosecutor to comment about the defendant's demeanor, "where such comment did not suggest personal knowledge of the prosecutor[.]" *Id.* at 296-97 (citing *Com. v. Smith*, 444 N.E.2d 374, 380 (Mass. 1983)).

The view taken by the Massachusetts court is, we believe, the sounder one. Whether the defendant writes with his right or left hand during trial is a matter plainly within the jury's observation and, in our view, is no different than the defendant's height, weight, hair color, or skin tone. All are matters that the jury may take into account where relevant, and it is not improper for the prosecutor to call the jury's attention to such

22

personally identifying characteristics of the defendant, so long as the jurors had an opportunity to observe them, and they are relevant to the case.

**CASE REMANDED WITHOUT AFFIRMANCE OR REVERSAL TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO ABIDE THE RESULT.**